## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**JORGE MIGUEL FUENTES FUENTES,**

    *Plaintiff*,

**v.**

**MENNONITE GENERAL HOSPITAL, INC.**, *et al.*,

    *Defendants*.

Civ. No. 22-01471 (MAJ)

## OPINION AND ORDER

### I. INTRODUCTION

This diversity medical malpractice action is brought by Jorge Miguel Fuentes Fuentes ("Plaintiff") against Mennonite General Hospital, Inc., Dr. Elizardo Matos Cruz ("Dr. Matos"), and their respective insurers under 28 U.S.C. § 1332 and Articles 1536, 1541 of the Puerto Rico Civil Code. (**ECF No. 1**). Plaintiff's Complaint (the "Complaint") alleges Mennonite General Hospital Inc. (hereinafter "Defendants" or "Hospital") and Dr. Matos should be held liable for the death of Maria Mercedes Fuentes Miranda ("Decedent"), Plaintiff's grandmother. (**ECF No. 1**).

According to Plaintiff, Defendants departed from the applicable standards of care during her medical treatment, and their negligence ultimately caused her untimely death on February 5, 2022. *Id*. As a result, Plaintiff claims to have suffered significant emotional harm and seeks damages of "not less than" $1,000,000 for the pain and suffering he continues to endure. *Id*. at 18-19.

Before the Court is a Motion for Summary Judgment (the "Motion") submitted by the Hospital. (**ECF No. 34**). This Motion seeks dismissal of all claims under Fed. R. Civ. P. 56, arguing that Plaintiff's emotional damages fail to meet the $75,000 jurisdictional

threshold for diversity cases, thereby depriving this Court of subject matter jurisdiction. *Id*. at 2, 5, 9-15.

In addition, Defendants present three alternative grounds for summary judgment: (1) insufficient evidence of nursing staff negligence, (2) non-liability for the treating physician's alleged negligence, and (3) lack of evidence for direct liability regarding staff training, protocols, and supervision. *Id*. at 15-24. Defendants argue each ground independently warrants summary judgment in their favor.

After a close examination of the record and the applicable statutory and case law, the Court **GRANTS** Defendants' Motion for Summary Judgment. (**ECF No. 34**). Plaintiff fails to establish emotional distress claims exceeding the $75,000 jurisdictional threshold under 28 U.S.C. § 1332. Even assuming the jurisdictional threshold were satisfied, Plaintiff's medical malpractice claims also fail as a matter of law due to insufficient admissible expert testimony demonstrating that Defendants' conduct was the most probable cause of Decedent's harm.

## II.    BACKGROUND

Plaintiff filed the instant Complaint on September 28, 2022, seeking damages for emotional distress due to his grandmother's death while under postoperative care at Defendants' facilities. (**ECF No. 34-1 at ¶ 1**). Plaintiff's Complaint solely claims emotional and mental anguish, not physical or economic damages. *Id*. ¶ 3. Defendants are accused of being vicariously and directly liable for the alleged negligent actions of its nursing and medical staff during the treatment of Plaintiff's grandmother. *Id*. ¶ 4.

Plaintiff asserts that the treatment provided was below the acceptable medical standard, contributing to his grandmother's death. *Id*. ¶ 5. Defendants' personnel allegedly failed to exercise proper care, lacked necessary medical knowledge, and did not

have the required equipment to prevent the injuries and death of Decedent. *Id.* ¶ 6. Specific failures include not recognizing post-surgery symptoms, not reporting a hematoma, pain, and edema in the neck, and delaying necessary medical interventions. *Id.* ¶¶ 7-13. Plaintiff also claims that the nursing staff did not perform essential assessments or notify physicians about significant changes in Decedent's condition. *Id.* ¶¶ 15-17. The nursing staff allegedly did not follow protocols for proper patient care and monitoring, leading to further deterioration of Decedent's condition. *Id.* ¶¶ 18-20.

## III.   FINDINGS OF FACT

In making findings of fact, the Court analyzed Plaintiff's Amended Complaint (**ECF No. 1**), Defendants' Motion for Summary Judgment and Statement of Uncontested Material Facts (**ECF Nos. 34, 34-1**), Plaintiff's Opposition to Defendant's Motion for Summary Judgment (**ECF No. 36**), Plaintiff's Opposing Statement and Additional Statement of Uncontested Material Facts (**ECF No. 37**), as well as the totality of the record. After applying Fed. R. Civ. P. 56(c) and Loc. Rule 56(c), and only crediting material facts that are properly supported by a record citation and uncontroverted, the Court makes the following findings of fact:[1]

---

[1]    Local Rule 56 requires a party opposing summary judgment to submit with its opposition a "separate, short, and concise statement of material facts" not set forth by the movant. D.P.R. Loc. Civ. R. 56(c). *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011). The movant must then submit a reply statement, in which it "shall admit, deny or qualify those additional facts." D.P.R. Loc. Civ. R. 56(d). Facts not denied, qualified, or otherwise "properly controverted" are deemed admitted. D.P.R. Loc. Civ. R. 56(e).

Local Rule 56 focuses on facts, "not speculation or argumentation." *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53 at 56–57. Moreover, these facts must be material. *Id.* Here, Defendants, did not submit a reply denying, qualifying, or otherwise properly controverting Plaintiff's Additional Statement of Uncontested Material Facts. (**ECF No. 37**). Therefore, those facts that are material and not speculative or argumentative are uncontested and thus admitted. *See* D.P.R. Loc. Civ. R. 56(e); *Tropigas de Puerto Rico, Inc.*, at 56–57.

1. On January 25, 2022, Plaintiff's grandmother underwent a carotid endarterectomy[2] performed by Dr. Elizardo Matos at Defendants' facilities. (**ECF No. 34-1 at ¶ 34**).

2. Plaintiff was not present in Puerto Rico on January 25, 2022, the date of Decedent's carotid endarterectomy. (**ECF No. 37-2 at 5**).

3. Decedent was a patient of Dr. Elizardo Matos and had visited his private office before undergoing the carotid endarterectomy. (**ECF No. 34-1 at ¶ 34**; **ECF No. 37 ¶ 35**).

4. Dr. Matos, who had medical privileges at Defendants' facilities, was not an employee of the hospital. (**ECF No. 34-1 at ¶ 37-38**).

5. Dr. Matos had been granted medical privileges to use the facilities of the Hospital to tend and treat his private patients. *Id*. ¶ 37.

6. Decedent visited the private office of Dr. Matos once on December 9, 2021, per a recommendation and referral issued by her treating cardiologist, Dr. Pedro Colón. (**ECF No. 37 at 3**).

7. Decedent was a private patient of Dr. Matos. (**ECF No. 34-1 at ¶ 35**).

8. Decedent did not go directly to the Hospital to seek medical aid nor was Dr. Matos the physician assigned by Defendants to treat her. (**ECF No. 34-1 at ¶ 36; ECF No. 34-3 at 8**).

9. The medical history of Decedent was a critical one before undergoing the carotid endarterectomy. (**ECF No. 37-2**).

10. According to Plaintiff's deposition testimony, Decedent was at immediate risk of a stroke or other life-threatening event. (**ECF No. 34-5 at 20, 32**).

11. Plaintiff acknowledges his grandmother's well-being was not as robust as it had been over the past three years before the surgery. He describes her as looking "fragile", "thinner" and that "she was declining." (**ECF No. 37-2 at 5**).

12. Plaintiff's grandmother died at Defendants' facilities on February 5, 2022, at the age of 80. (**ECF No. 34-1 at ¶ 32**).

13. Plaintiff was 33 years old at the time of his grandmother's death. *Id*. ¶¶ 39-42.

14. He resided in California at the time of his grandmother's passing. *Id*.

15. Plaintiff joined the U.S. Navy in 2010. *Id*.

16. Plaintiff had not lived in Puerto Rico since joining the U.S. Navy in 2010. *Id*.

---

[2]        A carotid endarterectomy is "[a]n operation on the carotid artery for the removal of a part of  the . . . (innermost lining) and any material that . . . (stops up) the . . . passage." *Halker v. United States*, 07-cv-1456, 2010 WL 2838468, at *1 (S.D. Ind. July 16, 2010) (citing J.E. Schmidt, *Attorney's Dictionary of Medicine and Word Finder* at C-92 (Dec. 2009)). The carotid is "[o]ne of the two main arteries . . . one on each side of the neck, which supply blood to the head." *Id*.

17. From 2010 to the date of Decedent's passing, Plaintiff resided in the State of Washington and the State of California. (**ECF No. 34-1 ¶ 42**).

18. In California, Plaintiff resides with his wife and children. (**ECF No. 34-5 at 4**).

19. Plaintiff has been working as a senior project manager at PNC Bank since October of 2022. As of the date of his deposition, March 23, 2023, Plaintiff was still working as a senior project manager at PNC Bank. *Id.* at 4-8.

20. Plaintiff characterizes his grandmother as a mother figure due to the significant role she played in his upbringing. (**ECF No. 37-2**).

21. While growing up, Plaintiff's parents were small business owners in Aibonito, Puerto Rico. (**ECF No. 37 at 9**). Because of the work demands of his parents, Plaintiff would spend time every day after school at his grandmother's house. *Id.*

22. As an adult, Plaintiff would speak to his grandmother through "Facetime" or telephone on a weekly basis before her passing. (**ECF No. 37-2 at 8**).

23. Plaintiff would "try" to visit his grandmother in Puerto Rico approximately twice a year. (**ECF No. 34-1 at ¶¶ 43-44, 46**; **ECF No. 34-5 at 18**; **ECF No. 37 at 3 ¶ 43**; **ECF No. 37-2 at 3**).

24. Plaintiff could not always visit his grandmother twice a year, because his naval service required that he be "deployed" abroad or participate in an "operation" that made traveling to Puerto Rico not feasible. (**ECF No. 37-2 at 3**); (**ECF No. 34-5 at 22**).

25. Since 2010, Plaintiff's naval career had him stationed in different Naval bases across the continental United States. *Id.*

26. He also served abroad in various locations such as Panama, Colombia, and Mexico. *Id.*

27. Moreover, from time to time, he would be assigned classified missions, such as the one he was on in 2018. (**ECF No. 34-5 at 8**).

28. During the pandemic, Plaintiff was unable to travel to Puerto Rico as he was "stuck on a ship in the middle of the sea." (**ECF No. 34-5 at 26**).

29. In 2020, Plaintiff began receiving mental health treatment, based on his discovery of a subordinate's suicide while stationed onboard a naval vessel. (**ECF 34-5 at 26**).

30. Before January 25, 2022, Plaintiff was prescribed Cymbalta which is an anti-depression medication. (**ECF No. 37-2 at 7, 10**). His dosage for this psychotropic medication was thirty milligrams before his grandmother's death. *Id.*

## IV.    SUMMARY JUDGMENT LEGAL STANDARD

Summary judgment is appropriate when there is no dispute as to any material fact and only questions of law remain. *White v. Hewlett Packard Enterprise Co.,* 985 F.3d 61, 68 (1st Cir. 2021). "A genuine dispute is one that a reasonable factfinder could resolve in favor of either party." *Flood v. Bank of Am. Corp.,* 780 F.3d 1, 7 (1st Cir. 2015) (citing *Gerald v. Univ. of P.R.,* 707 F.3d 7, 16 (1st Cir. 2013)). "A fact is material if it has the potential of affecting the outcome of the case." *Taite v. Bridgewater State U., Bd. of Trustees,* 999 F.3d 86, 93 (1st Cir. 2021) (cleaned up).

To win summary judgment on a particular issue, the moving party must show that "there is an absence of evidence to support" the nonmoving party's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). The party moving for summary judgment "bears the initial burden of showing that no genuine issue of material fact exists." *Feliciano-Muñoz v. Rebarber-Ocasio,* 970 F.3d 53, 62 (1st Cir. 2020) (citation omitted). This burden is met "when the moving party demonstrates that the opposing party has failed to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *E.E.O.C. v. Kohl's Dept. Stores, Inc.,* 774 F.3d 127, 131 (1st Cir. 2014) (internal quotations and citation omitted).

In opposing a motion for summary judgment, the plaintiff "bears the burden of producing specific facts sufficient to" defeat summary judgment. *González-Cabán v. JR Seafood Inc.,* 48 F.4th 10, 14 (1st Cir. 2022) (internal quotations and citation omitted). The Court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Cochran v. Quest Software, Inc.,* 328 F.3d 1, 6 (1st Cir. 2003) (citation omitted). Furthermore, the Court must review the record as a whole and avoid assessing the credibility or gauging the

weight of the evidence presented. *Pina v. Children's Place,* 740 F.3d 785, 802 (1st Cir. 2014).

The goal of "summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Carrozza v. CVS Pharmacy, Inc.,* 992 F.3d 44, 56 (1st Cir. 2021). In short, for Defendants to prevail on summary judgment, they "must demonstrate that, even admitting well-pleaded allegations in the light most favorable to Plaintiff, the applicable law compels a judgment in its favor." *Vega-Martínez v. Hosp. San Antonio Inc.,* 18-cv-1055, 2022 WL 4539850, at *3 (D.P.R. Sept. 28, 2022).

## V.    APPLICABLE LAW

### a.    *Establishing Amount in Controversy Meets $75,000 Threshold*

District courts have original jurisdiction over civil suits between citizens of different states where the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332(a)(1); *Alers v. Barceló*, 152 F. Supp. 3d 59, 64 (D.P.R. 2016). Diversity of citizenship is established as of the time the plaintiff files the suit. *Id.* (citing *Bank One, Texas, N.A. v. Montle*, 964 F.2d 48, 49 (1st Cir. 1992)).

The "amount in controversy" threshold is designed to ensure that federal courts are not burdened with cases more appropriately handled at the state level. *Cruz-Martínez v. Hosp. Hermanos Meléndez, Inc.*, 475 F. Supp. 2d 140, 142-43 (D.P.R. 2007); *see e.g.*, *Spielman v. Genzyme Corp.*, 251 F.3d 1 (1st Cir. 2001) (courts have the duty to police the border of federal jurisdiction); *American Policyholders Ins. Co. v. Nyacol Products, Inc.*,

989 F.2d 1256, 1258 (1st Cir. 1993) ("A federal court is under an unflagging duty to ensure that it has jurisdiction over the subject matter of the cases it proposes to adjudicate.").[3]

The party invoking diversity jurisdiction bears the burden of establishing that the amount-in-controversy requirement is satisfied. *Andersen v. Vagaro, Inc.*, 57 F.4th 11, 14 (1st Cir. 2023). The burden of demonstrating complete diversity must be done by a preponderance of the evidence. *See Toste Farm Corp. v. Hadbury, Inc.*, 70 F.3d 640, 642 (1st Cir. 1995); *García-Pérez v. Santaella*, 364 F.3d 348, 350 (1st Cir. 2004).

In *St. Paul Mercury Indem. Co. v. Red Cab Co.*, the U.S. Supreme Court established that a case should only be dismissed for lack of jurisdictional amount if it "appear[s] to a legal certainty that the claim is really for less than the jurisdictional amount," provided the claim is made in good faith. 303 U.S. 283, 288-89 (1938).

The First Circuit interprets "good faith" to include "objective good faith," which is measured by whether the claim could be viewed as worth more than the jurisdictional minimum by anyone familiar with the applicable law. *Abdel-Aleem v. OPK Biotech LLC*, 665 F.3d 41 (1st Cir. 2012); *Esquilín-Mendoza v. Don King Prods.*, 638 F.3d 1, 4 (1st Cir. 2011) (finding even if the plaintiff's $1 million claim, based in part on emotional distress, was made in good faith, diversity jurisdiction was absent because it was legally certain that the plaintiff's damages could not remotely approach $75,000.).

Generally, a plaintiff's allegations suffice "unless questioned by the opposing party or the court." *Stewart v. Tupperware Corp.*, 356 F.3d 335, 338 (1st Cir. 2004). Once challenged, "the party seeking to invoke jurisdiction has the burden of alleging with

---

[3]        The jurisdictional amount of 28 U.S.C. § 1332 functions to "not be so high as to convert the Federal courts into courts of big business nor so low as to fritter away their time in the trial of petty controversies." *Zahn v. Int'l Paper Co.*, 414 U.S. 291, 294 n.2 (1973) (citing H.R. Rep. No. 85-1706, at 3-4 (1958), as reprinted in 1958 U.S.C.C.A.N. 3099, 3101).

*sufficient particularity*, facts indicating that it is not a legal certainty that the claim involves less than the jurisdictional amount." *Department of Recreation & Sports of P.R. v. World Boxing Ass'n*, 942 F.2d 84 (1st Cir. 1991) (emphasis added); *see also Hardemon v. City of Boston*, 144 F.3d 24, 26 (1st Cir. 1998) (finding that "once diversity jurisdiction has been challenged, the burden shifts from merely averring the amount in controversy to *substantiating* the amount in controversy.") (emphasis added).

"To fend off a jurisdictional challenge, a plaintiff may amend the complaint or submit additional documentation, such as affidavits, medical reports, or interrogatories." *Andersen v. Vagaro, Inc.*, 57 F.4th 11 at 15 (noting "merely reiterating general descriptions of damages is insufficient"); *see also Abdel-Aleem v. OPK Biotech* LLC 665 F.3d at 42–43 (affirming dismissal where the plaintiff proffered only "bald statements and round numbers" in response to a jurisdictional challenge); *see Diefenthal v. Civ. Aeronautics Bd.*, 681 F.2d 1039, 1053 (5th Cir. 1982) (explaining that when the damage amount is challenged, the burden is on the plaintiff to establish the factual basis for the claim).

In short, "[j]urisdiction is not conferred by the stroke of a lawyer's pen." *Diefenthal v. Civ. Aeronautics Bd.*, 681 F.2d 1039 at 1052. When challenged, a plaintiff must: (1) provide an objective good faith claim to the amount sought; and (2) substantiate their claims with sufficient detail "adequately founded in fact." *Abdel-Aleem*, at 43; *Torres-González v. HIMA San Pablo Caguas*, 650 F. Supp. 2d 131, 134–35 (D.P.R. 2009). Where it appears to a legal certainty that the claim is really for less than the jurisdictional amount—dismissal is required. *Arcudi v. Builder Servs. Grp., Inc.*, 673 F. Supp. 3d 9, 14 (D. Mass. 2023).

### b.    Derivative Claims for Emotional Harm under Puerto Rico Law

Under Puerto Rico law, "individuals who are harmed because a close relative or loved one is tortiously injured may invoke Article 1802 as a vehicle for prosecuting a cause of action against the tortfeasor." *Díaz-Nieves v. Puerto Rico*, 858 F.3d 678, 689 (1st Cir. 2017); *see also Santana–Concepción v. Centro Médico del Turabo, Inc.*, 768 F.3d 5, 10 (1st Cir. 2014) ("Under the law of torts in Puerto Rico, including medical malpractice . . . relatives are entitled to 'compensation for the sufferings, emotional distress, or mental anguish experienced as a consequence of . . . damages caused directly to their relatives.'").

However, a relative's tort claim "is derivative and depends on the viability of the underlying claim of the relative." *Méndez–Matos v. Municipality of Guaynabo*, 557 F.3d 36, 57 (1st Cir. 2009) (internal citations omitted.) A "wholly derivative" claim, requires a plaintiff to prove three elements: "(1) that he has suffered emotional harm, (2) that this harm was caused by the tortious conduct of the defendant toward the plaintiff's relative or loved one, and (3) that the defendant's conduct was tortious or wrongful." *Vargas-Colón v. Fundación Damas, Inc.*, 864 F.3d 14, 22 (1st Cir. 2017) (quoting *Méndez-Matos v. Municipality of Guaynabo*, 557 F.3d 36, 57 (1st Cir. 2009)).

Under Puerto Rico caselaw, courts have traditionally "awarded moral damages to the parents, spouses, common-law spouses, ex-spouses, sons and daughters, and siblings of a deceased." *Castillo-Quiñones v. Hosp. de la Concepción, Inc.*, 18-cv-1724, 2021 WL 2451191, at *2 (D.P.R. June 15, 2021); *see e.g.*, *Rivera- Concepción v. Pepsi Cola of Puerto Rico*, 288 F. Supp. 2d 167, 173 (D.P.R. 2003) (holding that those related by blood ties to a deceased will foreseeably "suffer for the loss of said loved one because they are deprived of their love, care, attention and company."); *Santana-Otero v. United States*, 2009 WL 10721032 (D.P.R. 2009) (awarding damages for mental distress and loss of

companionship to an adult son who lived in the continental United States and was not present when his father was subject to medical malpractice in Puerto Rico).

Here, Plaintiff's wholly derivative claim requires that he prove: (1) he suffered emotional harm; (2) and that this harm was caused by Defendants' alleged tortious acts against Plaintiff's grandmother. As mentioned, because this derivative action is based on diversity of citizenship, the emotional damages Plaintiff seeks must satisfy the jurisdictional threshold under 28 U.S.C. § 1332. The aforementioned criteria must be met before the Court can consider the underlying medical malpractice claim.

With this backdrop, the Court begins with an examination of whether the emotional damages claimed by Plaintiff meet the jurisdictional threshold of $75,000 as required under § 1332.

## VI.    ANALYSIS – AMOUNT IN CONTROVERSY

Defendants do not dispute that there is complete diversity between the parties. 28 U.S.C. § 1332. Instead, Defendants dispute that Plaintiff, the party invoking federal diversity jurisdiction, has met his burden of alleging facts with sufficient particularity, "that it is not a legal certainty that the claim involves less than" $75,000. (**ECF No. 34 at 9-15**); *Stewart v. Tupperware Corp.*, 356 F.3d 335 at 338.

Defendants' Motion for Summary judgment emphasizes that Plaintiff's grandmother's health had been declining over the previous three years due to aging, and she was at a high risk of a stroke if she did not undergo surgery. (**ECF No. 34 at 9-14**). Defendants contend that Plaintiff, aware of his grandmother's deteriorating condition, had even advised against the surgery, suggesting she should "live her life and let the chips fall where they fall." (**ECF Nos. 34 at 9-14**; **34-5 at 32**). Defendants highlight that

Plaintiff was not in Puerto Rico at the time of his grandmother's surgery and thus, not directly involved in her final days. (**ECF No. 34 at 9-14**).

To that end, the Motion points out that Plaintiff had been physically and geographically distanced from his grandmother for a majority of his life, as he left for the Navy in 2010 and never again resided in Puerto Rico, where his grandmother lived. "From 2010 to the date of his grandmother's death, Plaintiff usually visited Puerto Rico only twice a year and his stays were usually for less than a week." (**ECF No. 34 at 14**). Furthermore, Defendants note that Plaintiff had a steady job, was married, and resided with his wife and two young children in California at the time of his grandmother's death. *Id.* "While we all endure problems in our daily lives, one can say that Plaintiff has an independent life of his own, is employed[,] and has the companionship of his family." *Id.*

Lastly, Defendants emphasize that "contrary to some of the cited cases, Plaintiff in this case did not retain an expert to provide opinion testimony as to his emotional well-being *after* his grandmother's death." (**ECF No. 34 at 14-15**) (emphasis added). Although Plaintiff claims to suffer from post-traumatic stress disorder ("PTSD") and general anxiety, Defendants aver that these were preexisting conditions diagnosed before his grandmother's death and triggered by unrelated traumatic events. *Id.* at 11-15.

Defendants rely most heavily on *Irizarry-Vázquez v. Misericordia*, in support of their contention that it is a legal certainty that Plaintiff's damages do not exceed $75,000. (**ECF No. 34 at 11**); 13-cv-1388, 2016 WL 5135790, at *1 (D.P.R. Sept. 21, 2016). In *Irizarry-Vázquez*, the Court awarded $10,000 for emotional damages suffered by a plaintiff due to his elderly father's death. *Id.* at 3. The Court considered that the plaintiff, sixty-four years old at the time of his father's death, had the opportunity to spend several

decades with his father and was geographically separated from him for most of his life. *Id*.

Defendants also cite *Casillas-Sánchez v. Ryder Hospital, Inc*. and *Correa v. Hospital San Francisco,* to illustrate that even minor plaintiffs who lost relatively young grandparents were awarded less than $75,000 for their emotional damages. (**ECF No. 34 at 13**); *Casillas-Sánchez v. Ryder Mem'l Hosp., Inc*., 960 F. Supp. 2d 362, 363 (D.P.R. 2013); *Correa v. Hosp. San Francisco*, 69 F.3d 1184 (1st Cir. 1995). Defendants argue that the plaintiffs in these cases faced more severe circumstances than the adult plaintiff in the present case, who lost his elderly grandmother. (**ECF No. 34 at 12-15**).

Similarly, Defendants highlight that in *Valdivieso-Ortiz v. Burgos* and *Santa v. U.S*., the emotional damage awards for the loss of close family members, including young parents, were well below the $75,000 threshold. *Id*.; *Valdivieso-Ortiz v. Burgos*, 807 F.2d 6, 8 (1st Cir. 1986) (a plaintiff was awarded $20,000 for the emotional damages following her son's death); *Santa v. U.S*., 180 F.3d 20, 24 (1st Cir. 1999) (minor children were awarded $2,000 each for emotional damages following their father's death, with an additional $1,000 for loss of guidance.).

By extension, Defendants contend that losing a family member of advanced age is less traumatic compared to losing a younger relative. (**ECF No. 34 at 12-15**). They argue that an adult, aware of an elderly relative's declining health, is more emotionally prepared for such a loss than someone who loses a younger, healthier family member unexpectedly. *Id*. Defendants assert that Plaintiff's situation is less severe compared to cases where plaintiffs were awarded less than $75,000 for similar emotional distress claims. *Id*. They also note that Plaintiff's life circumstances—including his stable job, family, and independence—differ significantly from plaintiffs in other cases, who were more directly

dependent on the deceased relative. *Id.* Defendants conclude that it is legally certain that Plaintiff's damages do not meet the $75,000 threshold, and thus the Court should grant summary judgment for lack of subject matter jurisdiction *Id.*

In his opposition to Defendants' Motion for Summary Judgment, Plaintiff argues that the jurisdictional amount in damages has been met. (**ECF No. 36**). Specifically, Plaintiff contends that the alleged wrongful death of his grandmother, who was "like a second mother" to him, constitutes a significant emotional harm that warrants compensation exceeding the jurisdictional requirement. As Plaintiff puts it, his claim "involves more than the threshold jurisdictional amount and, therefore, this court has subject matter jurisdiction to entertain this claim under diversity principles." *Id.* at 2. Plaintiff asserts that her premature death caused him "extreme emotional pain and suffering" which exacerbated his preexisting post-traumatic stress disorder and anxiety. *Id.* at 8. And while he "was indeed receiving psychological treatment before his grandmother's death," her untimely passing worsened his symptoms necessitating "an increased dosage of antidepressant medication." (**ECF No. 36 at 8**).

Plaintiff emphasizes that his emotional suffering is not only substantial but well-documented, citing the clinical notes of his treating therapist who noted that his symptoms were "more severe than normal bereavement symptoms" due to the nature of his grandmother's death. (**ECF No. 36 at 9**). Plaintiff also argues that the emotional distress from watching his grandmother's death following the medical procedures conducted by Defendants significantly surpasses the jurisdictional threshold. (**ECF No. 36 at 6**).

Plaintiff further argues that the evidence presented in support of his opposing statement of facts creates a trial-worthy issue of material fact, and therefore, Defendants'

Motion should be denied. Plaintiff concludes that given the severity and documented nature of his emotional distress, it is evident that his claim involves more than the jurisdictional amount, thereby affirming the court's subject matter jurisdiction in this case. (**ECF No. 36 at 12**).

### a.    *Analyzing Analogous Caselaw & Closeness of Emotional Bond*

Turning now to the Court's analysis, the Court notes that Plaintiff primarily relies on three key cases to support his arguments*: Suero-Algarín v. CMT Hosp. Hima San Pablo Caguas*, 957 F.3d 30 (1st Cir. 2020); *Rosario Ortega v. Star-Kist Foods, Inc*., 370 F.3d 124 (1st Cir. 2004); *Correa v. Hosp. San Francisc*o, 69 F.3d 1184 (1st Cir. 1995).[4]

Drawing from *Rosario Ortega v. Star-Kist Foods*, courts have considered several indicia in evaluating a plaintiff's claim for emotional suffering, including: the unexpected nature of the death, plaintiff's age, deceased's age, their shared living situation, the regularity of their interactions, and the plaintiff's lasting psychological impact corroborated with evidence. *See Delgado-Caraballo v. Hosp. Pavía Hato Rey, Inc*., 14-cv-1738, 2021 WL 813086, at *2 (D.P.R. Jan. 14, 2021) (citing *Rosario Ortega v. Star-Kist Foods, Inc*., 370 F.3d 124, 129 (1st Cir. 2004) (reversed on other grounds)).

That said, a party's self-serving statements are subject to judicial skepticism when contradicted by other evidence. *White v. All America Cable & Radio, Inc*., 642 F. Supp. 69, 72 (D.P.R. 1986); *Palmas del Mar Homeowners Ass'n v. Fox*, 2008 U.S. Dist. LEXIS 25790, at *22 (D.P.R. Mar. 31, 2008). Moreover, a plaintiff cannot rely on

---

[4]      Plaintiff also addresses that expert testimony is not necessary to support claims of emotional distress citing *Sanchez v. P.R. Oil Co*., 37 F.3d 712, 724 (1st Cir. 1994), and *Koster v. TWA*, 181 F.3d 24, 35 (1st Cir. 1999). Moreover, Plaintiff notes that testimony concerning depression and anxiety has been deemed adequate in cases such as, *Toro- Cotto v. Liga Puertorriqueña Contra El Cáncer*, 04-cv-1285, 2007 WL 527661, at *7 (D.P.R. Feb. 14, 2007). Finally, Plaintiff correctly points out that courts have acknowledged that converting emotional suffering into monetary terms is an imprecise process, as noted in *Correa v. Hosp. San Francisco*, 69 F.3d 1184, 1198 (1st Cir. 1995).

unsubstantiated allegations once jurisdiction is challenged. *Del Rosario Ortega v. Star-Kist Caribe, Inc.*, 130 F. Supp. 2d 277, 280 (D.P.R. 2001). "No presumption of truthfulness attaches to the allegations." *Id.*

The Court agrees with Plaintiff that *Rosario Ortega v. Star-Kist Foods, Inc.* is instructive here. 370 F.3d 124 (1st Cir. 2004). In fact, the Court will use the framework set forth in that case to guide the Court's analysis as to whether Plaintiff has met his burden of "alleging with sufficient particularity facts indicating that it is not a legal certainty that the claim involves less than the jurisdictional amount." *Stewart v. Tupperware Corp.,* at 338.

In *Rosario Ortega*, a nine-year old girl cut her right pinky finger on a tuna can. 370 F.3d 124 (1st Cir. 2004). Her injuries led to surgery, the prospect of future surgery, minor permanent disability, and scarring. *Id.* The plaintiff and her family members sued in federal court, citing diversity jurisdiction. *Id.* As the First Circuit put it, the "[p]laintiffs' choice of federal court was no doubt influenced by the fact that civil jury trials are unavailable in the local courts of Puerto Rico." *Rosario Ortega*, at 126. The plaintiff and her family sought physical and emotional damages. *Id.* Specifically, the plaintiff's mother claimed that her emotional distress damages totaled $250,000. *Id.*

Following a *de novo* review of the amount in controversy for each plaintiff individually, the First Circuit held that the girl's claim met the statutory jurisdictional amount because, among other things, the medical prognosis was that the injury would become worse as she grew, and that she may need more surgery. *Rosario Ortega v. Star-Kist Foods, Inc.* is instructive here. 370 F.3d 124 (1st Cir. 2004). However, most pertinent to the instant matter, the mother's emotional distress claim fell short of the jurisdictional

minimum. Her daughter's injuries were relatively minor, and there was no dramatic witnessing of the accident or belief that the girl would die from the cut. *Id*. at 129–31.

Returning to the cases Plaintiff cites in support of his damages claim, Plaintiff's attempt to draw parallels from *Rosario Ortega* does little to support his claim for damages. (**ECF No. 36 at 10-12**). While the plaintiff there met their jurisdictional amount for what amounted to a minor cut, Plaintiff here did not suffer an actual physical injury. Moreover, the main plaintiff in *Rosario Ortega* had a medical prognosis that the injury could become worse with time. We have no such documented medical forecast here, as to our Plaintiff's detriment; he did not retain an expert to evaluate his mental and emotional condition in such a fashion. Thus, a more fitting comparison is to the plaintiff's mother in *Rosario Ortega*, who failed to meet the jurisdictional minimum. Accordingly*, Rosario Ortega*, offered by Plaintiff to overcome the instant jurisdictional challenge does the opposite. Instead, the precedent of *Rosario Ortega* strengthens the appearance that it is a legal certainty that Plaintiff's "claim is really for less than the jurisdictional amount." *See St. Paul Mercury Indem. Co. v. Red Cab Co*., 303 U.S. 283 at 288-89.

Plaintiff's other cases, *Suero-Algarín v. CMT Hosp. Hima San Pablo Caguas* and *Correa v. Hosp. San Francisco*, are also off the mark. 957 F.3d 30 (1st Cir. 2020); 69 F.3d 1184 (1st Cir. 1995). In *Suero-Algarín v. CMT Hosp. Hima San Pablo Caguas*, a jury awarded $1,000,000 for the emotional distress of a son who lost his father, which was later reduced to $400,000. *Id*. at 10. Despite the son living in Chicago and not seeing his father for eight years, the court recognized substantial emotional damages. *Id*.

Plaintiff asserts that his relationship with his grandmother, whom he viewed as a mother, is similarly significant. *Id*. Even if $400,000 might be considered excessive, Plaintiff claims that based on this precedent, his action "reasonably exceed[s] the

minimum $75,000 threshold . . . [and] could well be awarded up to $400,000." *Id*. The Court disagrees.

Plaintiff overstates the relevance of *Suero-Algarín* in his Opposition to Defendants' Motion. (**ECF No. 36**). The emotional distress in *Suero-Algarín* stemmed from a son losing his father, a relationship that courts have historically viewed as significant and likely to cause profound emotional impact. In contrast, Plaintiff in the present case is the grandson of Decedent. While he argues that his grandmother was like a mother to him, Plaintiff's actual mother testified that Plaintiff would often times stay with his grandparents because of her work schedule. (**ECF No. 37-8 at 23**).

While the Court acknowledges Decedent was undoubtedly *like* a mother to Plaintiff, it would be an overstatement based on the record, that his grandmother stepped in to serve as his mother, akin to acting *in loco parentis. See cf.*, *Rosales v. Encanto Rests., Inc.*, 994 F. Supp. 2d 214, 216-18 (D.P.R. 2014) (finding the record demonstrated the grandparents acted "*in loco parentis* by providing for [grandchild's] support, maintenance, protection, and guidance."). Plaintiff's actual mother played a role in his life. In detailing his emotional bond with his grandmother, Plaintiff stated, "I mean, anything that I didn't want to talk to my mom about, I probably talked to my grandmother about." (**ECF No. 37-2 at 8-9**).

There is nothing in the record to suggest Plaintiff's mother had been an absentee parent or otherwise failed to fulfill the responsibilities typically undertaken by a custodial biological parent. Moreover, there is nothing in the record to support that Decedent acted as anything more than a loving, nurturing, and emotionally supportive grandparent. As the preceding quoted statement shows, Plaintiff would ask his mother and grandmother for counsel. (**ECF No. 37-2 at 8-9**). However, he would turn to his grandmother at times.

*Id.* This again is nothing more than the role a grandparent typically provides, as grandparents often provide a different kind of support, free from the authority or judgment that can sometimes come with a parent-child relationship. To put a point on it, during Plaintiff's childhood he would "leave school and go to [his] grandmother's house" for a few hours until his parents got out of work at "6:00 pm." *Id.* at 8. This along with the emotional support mentioned does not transform the Decedent into his legal guardian, parent, or de facto mother. *Id.*

Given that "moral damages" are typically awarded "to the parents, spouses, common law spouses, ex-spouses, sons and daughters, and siblings of a deceased," based on the record here, the Court will not treat the loss of Plaintiff's grandparent to that of a child-rearing parent. *See Castillo-Quiñones v. Hosp. de la Concepción, Inc.*, 2021 WL 2451191, at *2.

As it relates to *Correa*, Plaintiff is correct that the First Circuit, did affirm the award of emotional damages in excess of $75,000 based on medical evidence. *Correa v. Hosp. San Francisco*, at 1197. However, there, the "plaintiffs presented both lay testimony and expert opinion evidence regarding their pain, suffering, and mental anguish (past, present, and future) . . . [and the] plaintiffs' expert testified . . . [that the] four grandchildren experienced sadness, suffering and the like that *would take up to five years to abate*." *Id.* (emphasis added).

Here, by contrast, Plaintiff did not present expert opinion "regarding his pain and suffering". He relies only on his testimony and some records from his therapist, which provide little information about his mental state[5] According to the records, Plaintiff

---

[5]     Plaintiff indicates he began receiving mental health treatment in 2020 following the suicide of one of his subordinates during a naval mission. (**ECF 34-5 at 26**).

suffered from "more sever[e] than normal bereavement symptoms." (**ECF No. 37-9**), and the doses of the Cymbalta medication he was taking increased. However, the record does not establish when these symptoms began following Decedent's death, nor is there any specific prognosis regarding the duration of his suffering. Moreover, the record is devoid of any information regarding what other condition or, treatment Plaintiff developed and/or required as the result of her grandmother's passing, Accordingly, *Correa v. Hosp. San Francisco* provides little, if any, support for the proposition that Plaintiff is entitled to a comparable award of damages for his bereavement symptoms, which remain inadequately substantiated with respect to their past, present, or future duration.

It is incumbent on the Court to ensure federal jurisdiction—particularly when challenged—as it is here. *See McCulloch v. Vélez*, 364 F.3d 1, 5 (1st Cir. 2004) ("It is black-letter law that a federal court has an obligation to inquire sua sponte into its own subject matter jurisdiction."). Accordingly, the Court looks to other factually analogous cases for additional guidance. Both *Soto-Collazo* and *Castillo-Quiñones v. Hosp. de la Concepción*, draw some resemblances and sharp distinctions to the instant matter.

First, in *Soto-Collazo*, the similarities to the present case include that both cases involve claims against a hospital and physicians for medical malpractice resulting in severe injuries and death of a close family member. *Soto-Collazo v. Centro Médico del Turabo, Inc.*, 18-cv-1256, 2021 WL 4056291, at *2 (D.P.R. June 14, 2021). Plaintiffs in both cases are grandchildren of the deceased patient.[6] *Id.* Plaintiffs in both allege intense emotional pain and suffering from the loss of their grandmother. *Id.*

---

[6]        In *Soto Collazo*, minor plaintiffs who were granddaughters of the decedent were represented by their parents. The parents did not appear as plaintiffs in their own individual capacity in the action. *Soto-Collazo v. Centro Médico del Turabo, Inc.*, 2021 WL 4056291, at *5.

There, the Court granted defendants' motion for summary judgment, finding plaintiffs "have not shown that it is not a legal certainty that the claim involves less than the jurisdictional amount." *Soto-Collazo v. Centro Médico del Turabo, Inc.*, 2021 WL 4056291, at *8-10 (cleaned up). In reaching its decision, the Court observed the granddaughters did not suffer academically in school or receive psychological treatment. *Id.* The Court concluded that it did not "overlook the fact that the grandchildren were certainly saddened by the death of their grandmother, but the [p]laintiffs' claims do not simply exceed the jurisdictional amount of $75,000." *Id.* at *10.

Next in *Castillo-Quiñones*, the plaintiff filed suit against various physicians and a hospital, alleging that medical malpractice resulted in the death of her father. *Castillo-Quiñones v. Hosp. de la Concepción, Inc.*, 18-cv-1724, 2021 WL 2451191, at *2 (D.P.R. June 15, 2021). The plaintiff sought over $1 million in emotional and mental damages and at least $25,000 for mental health expenses. *Id.* Defendants filed for summary judgment arguing the court lacked jurisdiction because the plaintiff's deposition testimony showed she did not have a close enough relationship with her deceased father to warrant damages over $75,000. *Id.* Moreover, the plaintiff did not live with her father during her childhood, and for almost a decade before her father's death, the plaintiff lived in Florida and would only see her father during her yearly visits to Puerto Rico. *Id.* Nevertheless, the Court in *Castillo-Quinones* denied summary judgment for lack of jurisdiction. The Court reached its decision based in part on "how [the plaintiff's] father provided her with emotional *and* financial support."). *Castillo-Quiñones v. Hosp. de la Concepción*, at *2 (emphasis in original).

Similarly, here, Plaintiff, did not live with his grandmother, and had not lived in Puerto Rico for years before the death, and would only "try" to see her on bi-yearly visits to Puerto Rico. (**ECF No. 1 at 4**; **ECF No. 37 at 3 ¶ 43**).

Where the instant matter and *Castillo-Quiñones* diverge is that the plaintiff there depended on her deceased father for "emotional *and* financial support." *Castillo-Quiñones v. Hosp. de la Concepción, Inc.*, 2021 WL 2451191, at *2 (emphasis in original). Here, on the other hand, Plaintiff "did not depend on the [decedent] economically." (**ECF No. 36 at 8**).

While moral damages are typically reserved for core family members, such as parents, "courts have still closely scrutinized the stability of the family nucleus and taken into consideration how strong the family ties were between plaintiffs and the victim." *Castillo-Quiñones*, at *2; *López-Nieves v. Marrero-Vergel*, 939 F. Supp. 124, 126–27 (D.P.R. 1996) (internal citation omitted). "Therefore, the farther away the blood tie or affective relationship is between [a] plaintiff and the deceased, the stronger the showing of suffering must be." *López-Nieves*, at 126–27.

Here, Plaintiff had been geographically distant from his grandmother for many years and could only "try" to visit Puerto Rico about twice a year for short stays (not more than a week) after moving away in 2010. (**ECF No. 34-1 at ¶¶ 43-44, 46**; **ECF No. 37 at 3 ¶ 43; ECF No. 37-2 at 3**). Indeed, his naval service limited his ability to travel to Puerto Rico, as he was stationed in different Naval bases across the continental United States, and also abroad in various locations such as Panama, Colombia, and Mexico. Moreover, from time to time, he would be assigned classified missions, such as the one he was on in 2018. (**ECF No. 34-5 at 8**). Also, during the pandemic, Plaintiff was unable to travel to Puerto Rico as he was "stuck on a ship in the middle of the sea." (**ECF No. 34-**

**5 at 26**). The Court also notes that when not on Naval duties, Plaintiff resided in California with his wife and children, where he is a Senior Project Manager at PNC Bank. *Id*. at 4.

Indeed, Plaintiff does provide testimony regarding a close bond with the deceased. However, most if not all of his assertions relate back to his childhood. (**ECF No. 34-1 at ¶¶ 43-46**); (**ECF Nos. 37 at 9; 37-2**). As an adult, in California, Plaintiff has a stable, independent life with a job, wife, and children. (**ECF No. 34-5 at 4**). As opposed to his childhood, in adulthood, there is nothing to suggest he relied on his grandmother for emotional or economic support. Nor does he contend that she relied on him for financial support or vice versa.

Moreover, Plaintiff was not aware of his grandmother's medical history and the precarity of her situation until shortly before her procedure, calling into question how close they truly were during the period leading up to her death. (**ECF No. 34-5 at 28**).

However, Plaintiff was aware of Decedent's fragile condition leading up to her procedure, and in fact objected to the surgery, citing she "was too fragile and too old. (**ECF No. 37-2 at 5**). Thus Plaintiff was more emotionally prepared for the potential loss of his grandmother, compared to minor children unexpectedly losing a young parent *See Irizarry-Vázquez v. Misericordia*, 13-cv-1388, 2016 WL 5135790, at *3 (D.P.R. Sept. 21, 2016) (noting "that while losing a family member before their time is always tragic, losing a parent of a somewhat advanced age is different from cases involving the untimely death of a young parent or the death of a child."); *Martínez-Álvarez v. Ryder Mem'l Hosp., Inc.*, 09-cv-2038, 2010 WL 3431653, at *7 (D.P.R. Aug. 31, 2010) (same).

These facts, viewed through an objective lens, suggest that while Plaintiff retains strong memories of his childhood relationship with his grandmother, those memories do

not fully reflect the reality of their adult relationship, where geographical distance and time had loosened the emotional connection. The evidence does not show a particularly close bond at the time of the alleged tortious conduct. Based on the record and given the "affective relationship" with the deceased was not especially close at or around the time of the events at issue, Plaintiff has failed to provide compelling evidence to substantiate a strong "showing of suffering." *See López-Nieves*, at 126–27.

### b.    *Substantiating Emotional Harm*

Equally important, Plaintiff did not provide an expert opinion on his emotional state after his grandmother's death that sufficiently substantiates his emotional suffering. The single paragraph note submitted by Licensed Family and Marriage Therapist, Edon Berkenstadt ("Berkenstadt"), on behalf of Plaintiff states:

> [t]he client's symptoms are more sever[e] than normal bereavement symptoms because of the way his grandmother passed away. The client has anxiety, depression, nightmares, loss of appetite, confusion, feelings of hopelessness and loss of purpose as well as a lack of trust in the medical system.

(**ECF No. 37-9**).

While the Court observes expert testimony in this domain is not needed to sustain an award for emotional damages, the absence of expert testimony *linking* Plaintiff's complained of emotional and mental harm is another opportunity Plaintiff fails to substantiate the jurisdictional amount. *Sanchez v. P.R. Oil Co.*, 37 F.3d 712, 724 (1st Cir. 1994); *Martínez-Álvarez v. Ryder Mem'l Hosp., Inc.*, 2010 WL 3431653, at *7 (D.P.R. Aug. 31, 2010) (absence of mental health expert helps gauge the injury against the emotional damages awarded).

To emphasize, although Plaintiff provides some documentation regarding his emotional distress by way of a therapist's note, (**ECF No. 37-9**) the Court finds this

hardly substantiates the emotional damage Plaintiff attributes to the death of his grandmother.[7] Although Plaintiff seeks damages for the emotional toll resulting from his grandmother's death, which he alleges was caused by negligent medical care, the therapist's note explicitly states that "the client's symptoms are more sever[e] than normal bereavement symptoms *because of the way* his grandmother passed away" (emphasis added). (**ECF No. 37-9**). This language suggests that Plaintiff's distress appears to stem more from his perception of his grandmother's final moments than from the alleged malpractice itself.

Although the therapist's note indicates his bereavement symptoms were more pronounced than typical, glaringly absent from the record, is any information from the health professional that prescribed Plaintiff's psychotropic medication. (**ECF No. 37-9**). Similarly, absent is any indication that Plaintiff's Cymbalta dosage was increased because of, or reasonably attributed to, the bereavement of his grandmother. In other words, the Court is left guessing if the increase in dosage can be objectively attributed to the death of Plaintiff's grandmother or if Plaintiff's already existing mental health conditions, including PTSD, *independently* caused the increase in dose. *See Martínez-Álvarez v. Ryder Mem'l Hosp., Inc.*, 09-cv-2038, 2010 WL 3431653, at *7 (D.P.R. Aug. 31, 2010) ("Although testimony from a mental health expert is not required to sustain an award for emotional distress, the absence of such evidence is useful in comparing the injury to the award of damages.").

---

[7]       The Court observes that while the parties refer to Berkenstadt as a "psychologist" (**ECF Nos. 37 at 10, 37-2 at 6, 10**), the note provided by Berkenstadt indicates they are licensed as a "LMFT" (Licensed Marriage and Family Therapist), not a psychologist. (**ECF No. 37-9**); *see Reyes v. Berryhill*, 16-cv-06958, 2017 WL 4310752, at *15 (N.D. Cal. Sept. 28, 2017) (noting "[w]hile licensed psychologists qualify as acceptable medical sources" the record did not reflect that the report provided by therapist licensed, presumably as a "LMFT" ("Licensed Marriage and Family Therapist"), qualified as a "licensed psychologist.").

While Plaintiff offers in his deposition that when his grandmother died, "the decision was taken by the doctor to increase the dose, given the persistent symptoms that were happening at the time," Plaintiff fails to substantiate "the doctor" increased his dosage *because of* his grandmother's death by way of competent proof. (**ECF No. 37-2 at 7-9**).[8] Plaintiff's self-serving statements regarding causation of his wholly derivative claim are not enough to meet his burden. *See Vargas-Colón v. Fundación Damas, Inc*., 864 F.3d 14 at 22. In short, Plaintiff lacks any competent proof that Defendants' "tortious conduct . . . toward" Plaintiff's "loved one caused" an exacerbation of Plaintiff's pre-existing mental health conditions. *See id.*

Viewed differently, the record shows that before his grandmother's death, Plaintiff's Cymbalta dosage was 30mg. (**ECF No. 37-2 at 7, 10**). Following her passing, the dosage was increased to 60mg. *Id*. However, after an unspecified period, the dosage was reduced back to 30mg. *Id*. Viewing the facts in the light most favorable to Plaintiff, even if the Court found that any mental anguish Plaintiff suffered can be causally attributed to Defendants' alleged tortious conduct, Plaintiff's mental anguish allegedly caused by Defendants lasted only during the period his medication dosage was at 60mg. But again, the Court is left guessing as to how long this period lasted.

Still, the fact that his anti-depression medication dosage returned to the pre-death baseline level of 30mg leads to the reasonable inference that his atypical bereavement symptoms subsided and are not lingering. Since jurisdiction has been challenged here, the burden shifts to Plaintiff to raise competent evidence to substantiate his jurisdictional claim of damages. *See Rodriguez v. Sears*, 349 F. Supp. 2d 211, 213 (D.P.R. 2004) ("Once

---

[8]     Plaintiff names a, "Doctor Hendricks" whom presumably was Plaintiff's primary care physician that initially prescribed him with Cymbalta while serving in the Navy and before his grandmother's death. *Id.* 37-2 at 10. However, medical evidence submitted by "Doctor Hendricks" is absent from the record.

a defendant questions jurisdiction by challenging the amount of damages alleged in the complaint, the burden shifts to the plaintiff to show that it is not a legal certainty that the claims do not involve the requisite amount."). Failing to address the timeline his medication dosages were adjusted falls short of meeting this burden. *Id.*

It is "clear that judges cannot allow conjecture to substitute for the evidence necessary to survive summary judgment." *Town of Westport v. Monsanto Co.*, 877 F.3d 58, 66 (1st Cir. 2017). Here, Plaintiff's claim for emotional damages relies heavily on his own subjective beliefs rather than objective proof. While self-serving testimony can be sufficient to withstand summary judgment, the First Circuit has made clear, "conclusory statements without support in the record are not enough to survive summary judgment." *Snell v. Neville*, 998 F.3d 474, 490 (1st Cir. 2021). Here, the Court does not doubt the sincerity of Plaintiff's alleged emotional distress. However, more than unsupported heartfelt assertions are required to surpass the jurisdictional threshold here.

The Court finds this unexplained gap in Plaintiff's medical health treatment insufficient to meet his burden of alleging with sufficient particularity facts indicating that it is not a legal certainty that the claim involves less than the jurisdictional amount. "Although testimony from a mental health expert is not required to sustain an award for emotional distress, the absence of such evidence is useful in comparing the injury to the award of damages." *Koster v. Trans World Airlines, Inc.*, 181 F.3d 24, 35 (1st Cir. 1999). This applies both to Plaintiff's claim of emotional damages based on the pain and suffering he has experienced and will continue to experience, as neither is grounded in particularized facts sufficient to substantiate the amount in controversy.

The Court acknowledges that Plaintiff's belief of the profound impact the loss of his grandmother has and will have on him is likely substantial. However, Plaintiff's own

subjective view of the amount of damages he should be awarded, which he contends should be no less than $1 million, which we have no reason to doubt is made in good faith, is just that—his subjective view. *See Esquilín-Mendoza v. Don King Prods.*, 638 F.3d 1, 4 (1st Cir. 2011) (finding even if plaintiff's $1 million claim, based in part on emotional distress, was made in good faith, it was legally certain that plaintiff's damages could not remotely approach $75,000.); *see also Torres v. Drs. Ctr. Hosp. Manatí*, 11-cv-1479, 2012 WL 1952833, at *6 (D.P.R. May 30, 2012) (finding plaintiff's emotional distress damages claim too tenuous to exceed $75,000 when no "special emotional peculiarities" were present.).

Rather, here, the Court has been tasked with evaluating Plaintiff's claim of emotional damages through an objective lens, tethered to detailed facts and not just on his own statements. *See González-Cabán v. JR Seafood Inc.*, 48 F.4th 10 at 14; *Abdel-Aleem*, at 41. After doing so, while taking the "evidence in the light most flattering" to Plaintiff and indulging all inferences in his favor, it appears to a legal certainty that the claim is really for less than the jurisdictional amount. *See Cochran v. Quest Software*, *Inc.*, 328 F.3d 1 at 6; *see also Arcudi v. Builder Servs. Grp., Inc.*, 673 F. Supp. 3d 9, 13–14 (D. Mass. 2023) ("jurisdiction is defeated notwithstanding the plaintiff's good faith in claiming for the jurisdictional amount if one familiar with the applicable law could not reasonably have concluded that the claim was worth the jurisdictional amount."). For that reason, here dismissal is required.

Ultimately, there is nothing else in the record that approaches substantiating Plaintiff's claims of intense emotional pain caused by Defendants' alleged tortious acts that existed at the time of filing his action or that are ongoing. *See Andersen v. Vagaro*, *Inc.*, 57 F.4th 11, 16 (1st Cir. 2023) (noting plaintiff's failure to provide additional records

she likely had possession or access to "which might have substantiated her claim" but did not provide, meant she failed to shoulder her burden of establishing the amount in controversy). Absent additional evidence, this Court concludes that Plaintiff has failed to provide sufficient facts to support the amount of emotional damages he seeks.

To summarize, the Court finds that Plaintiff has failed to demonstrate a sufficiently close bond with his grandmother to support his claim for emotional distress. Additionally, Plaintiff has not substantiated his emotional damages as exceeding the jurisdictional threshold. Accordingly, the Court holds that Plaintiff's emotional damages claim does not meet the requisite standard, and the action must be **DISMISSED**  for lack of subject matter jurisdiction.

## VII.   ANALYSIS – MEDICAL MALPRACTICE CLAIMS

In the alternative, even if the jurisdictional amount could be met, Plaintiff's claims of medical malpractice still fail to survive summary judgment. Plaintiff's claims encompass several interconnected areas of potential liability: nursing negligence, deficiencies in Defendants' patient care, supervision, and training for Defendants' alleged institutional shortcomings. (**ECF No. 1 at 7-13**). The Court will address each in turn.

### a.    *Direct Liability Claims of Negligence Against Defendants*

First as to nursing negligence, Defendants contend that Plaintiff's expert Dr. Adams' testimony regarding the adequacy of postoperative nursing care should be disregarded as inadmissible evidence under Federal Rule of Evidence 702 and the *Daubert* standard. (**ECF No. 34 at 19**). They argue that Dr. Adams admitted in his deposition that he has not formulated opinions on this matter and is not qualified to do so. *Id.*

Concerning Plaintiff's second expert, Nurse Regueira, Defendants contend her expert report does not demonstrate a causal connection between purported breaches of the standard of care and Decedent's passing. *Id*. at 19-20. Defendants assert that "Plaintiff's lack of expert evidence as to the issue of causation in regards to Defendants' nursing staff is dispositive." (**ECF No. 34 at 20**).

While Defendants acknowledge that Nurse Yadira Regueira provided opinions on the nursing staff's alleged deviations from the standard of care, they argue her "report is void of any discussion as to what casual nexus, if any, exists between these four (4) deviations and [Decedent's] death." (**ECF No. 34 at 19-20**).

Defendants contend Nurse Regueira only highlighted four specific deviations from the standard of care. *Id*. They argue that any claims based on deviations other than these four should be dismissed due to lack of expert opinion. *Id*. at 21. Based on these arguments, Defendants request dismissal of Plaintiff's claims related to alleged negligence by Defendants' nursing and medical staff. *Id*.

### i.    Causation Applicable Law

For medical malpractice, notwithstanding proof of both duty and breach, a plaintiff also must prove "a sufficient causal nexus between that act or omission and the alleged harm." *Cortés–Irizarry v. Corporación Insular de Seguros,* 111 F.3d 184, 189 (1st Cir. 1997). The causal nexus is sufficient if it is proven that the defendant's breach was "the factor that *in all probability caused* the harm to the patient." *Mercado-Velilla v. Asociación Hosp. del Maestro*, 902 F. Supp. 2d 217, 235 (D.P.R. 2012) (citing *Santiago-Otero v. Méndez, et al.*, 135 D.P.R. 540, 1994 P.R. Offic. Trans. 909, 224, 1994 WL 909224 (1994) (citations omitted) (emphasis added).

Put differently, a plaintiff must prove, by a preponderance of the evidence, that the doctor's negligent conduct was the factor that most probably caused the medical harm. *See Martínez-Serrano v. Quality Health Servs. of P.R., Inc.*, 568 F.3d 278, 286 (1st Cir. 2009) (citing *Lama v. Borras*, 16 F.3d 473, 478 (1st Cir. 1994)). Causation need not be established with mathematical accuracy, and neither must all other causes of injury be eliminated. However, "a jury normally cannot find causation based on mere speculation and conjecture." *Negrón-Adames v. Dorado Health Inc.*, 21-cv-01077, 2023 WL 7298776, at *6 (D.P.R. Nov. 6, 2023) (citing *Lama*, 16 F.3d at 478).

Expert testimony is generally indispensable for establishing causation, given the complex medical and scientific issues often involved in medical malpractice cases. *See Cruz-Vázquez v. Mennonite General Hosp., Inc.*, 613 F.3d 54, 56 (1st Cir. 2010) (citing *Pagés-Ramírez v. Ramírez-González*, 605 F.3d 109, 113 (1st Cir. 2010)).

This case does not fall into the "narrow band of possible exceptions to the general rule requiring expert testimony" where "common knowledge and experience are all that is necessary to comprehend a defendant's negligence." *See Mercado-Velilla v. Asociación Hosp. del Maestro*, 902 F. Supp. 2d 217 at 239; *Martínez–Serrano*, 568 F.3d at 286. The average layperson does not know whether the failure to promptly monitor a post-surgical patient, report symptoms such as hematoma formation, or perform timely neurological and cranial assessments post-operation *caused* Decedent's fatal injuries. *See id.*; (**ECF No. 34-9 at 18-22**).

To the contrary, determining whether Defendants' nursing staff's failure to monitor and report post-operative complications caused injuries to Decedent is the typical "complex medical and scientific issue that is prevalent in medical malpractice cases" and requires the assistance of a medical or scientific expert. *See Mercado-Velilla,*

at 239 (citing *Rojas–Ithier v. Sociedad Española de Auxilio Mutuo y Beneficiencia de P.R.*, 394 F.3d 40, 43 (1st Cir. 2005)).

### ii.    Discussion

From the outset of the Court's causation analysis, the Court will evaluate Defendants' charge that Dr. Adam's testimony should be excluded under Fed. R. Evid. 702.

During his deposition, Dr. Adams was questioned about his qualifications and opinions regarding nursing care. (**ECF No. 34-8 at 5-6**). He stated that he has never been qualified by any court as an expert witness in nursing. *Id.* In fact, he mentioned being disqualified from discussing specific nursing factors in a Puerto Rico court case, though he could not recall the specific case details. *Id.*

Regarding the current case, Dr. Adams clarified that he has not rendered an expert opinion on the nursing care given to the decedent. *Id.* He explained that he is not commenting on the standard of nursing care, but merely mentioned his personal observations about poor documentation based on his experience as a physician working with nurses. *Id.* He confirmed that he is deferring to Ms. Regueira, Plaintiff's nursing expert, on nursing-related issues. *Id.*

The relevant standard for the admission of expert testimony is Federal Rule of Evidence 702, which provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;
> (b)    the testimony is based on sufficient facts or data;
> (c)    the testimony is the product of reliable principles and methods; and
> (d)    the expert has reliably applied the principles and methods to the facts of the case.

*Carrozza v. CVS Pharmacy, Inc.*, 992 F.3d 44, 55-56 (1st Cir. 2021).

Under Rule 702, district courts consider the admissibility of expert testimony by determining whether "an expert's proffered testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* (cleaned up) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)).

Here, Dr. Adams' testimony must be excluded under Rule 702. Applying the legal standard from *Daubert*, Dr. Adams lacks the necessary qualifications to offer expert testimony on nursing care. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). As he conceded, "I have not been qualified to talk about nursing care" and further confirmed that he had been "disqualified in Puerto Rico State Court as an expert witness in nursing." (**ECF No. 34-8 at 5-6**). Furthermore, his expressed deference to Plaintiff's nursing expert, remarking, "I'm not commenting on the standard of nursing care . . . I will be deferring to Ms. Regueira," effectively undermines any reliable foundation for his testimony. *Id.* at 6. As such, his testimony regarding nursing care is excluded.[9]

To maintain a medical malpractice claim against Defendants' nursing staff, the key issue now is whether Plaintiff's expert, Nurse Regueira, establishes sufficient proof of causation. (**ECF No. 34-9**). In her report, Nurse Regueira opines that the nursing care provided to the decedent, while admitted to the hospital, fell below the standard of care.

---

[9]    The Court acknowledges that Dr. Adams was previously deemed qualified by this Court to testify as an expert on the standard of care for nurses in Puerto Rico. In *Ramírez-Ortiz v. Corporación del Centro Cardiovascular de Puerto Rico y del Caribe*, the Court stated:

> [Defendant] also challenges Dr. Adams' credibility, claiming he 'has never been qualified as an expert on the governing commonwealth-wide standard of care governing nurses within Puerto Rico.' However, after reviewing Dr. Adams' curriculum vitae and deposition testimony, the Court finds him qualified as an expert for summary judgment purposes.

32 F. Supp. 3d 90, 98 (D.P.R. 2014). However, in this case, Dr. Adams' own admission—that he has "not been qualified to talk about nursing care" and was "disqualified in Puerto Rico State Court as an expert witness in nursing"—warrants the exclusion of his testimony.

*Id*. at 18. Specifically, she identifies "across the board nursing failures" in monitoring, assessment, and intervention. *Id*. While her report emphasizes various deviations from the standard of care, the issue of causation remains inadequately addressed. (**ECF No. 34-9**).

Nurse Regueira's conclusion that the decedent's "demise could have been avoided" had the nursing staff followed protocols, initiated appropriate treatment, and referred the patient for timely physician evaluation, suggests a possible link between the nurses' actions and Decedent's death. (**ECF No. 34-9 at 18**). However, such conclusions are insufficient to satisfy the standard for causation under Puerto Rico law. *See Mercado-Velilla v. Asociación Hosp. del Maestro*, 902 F. Supp. 2d 217, 235 (D.P.R. 2012) (to establish causal nexus, the defendant's breach must be "the factor that *in all probability caused* the harm to the patient") (emphasis added); s*ee also Martínez-Serrano v. Quality Health Servs. of P.R., Inc.*, 568 F.3d 278, 286 (1st Cir. 2009) (the plaintiff must show by a preponderance of the evidence, that the negligent conduct was the factor that most probably caused the medical harm.).

At best, these statements allow for an inference that the deviations were "a factor" in producing Decedent's harm. Yet, according to the First Circuit interpreting Puerto Rico law, establishing that a breach was merely "a factor" is not enough. *See Martínez-Serrano v. Quality Health Servs. of P.R., Inc.*, 568 F.3d 278, 286 (1st Cir. 2009) (doctor's negligent conduct must be the factor that most probably caused medical harm). The standard requires proof that Defendant's alleged breach was "the factor that in all probability caused the harm to the patient." *See Mercado-Velilla v. Asociación Hosp. del Maestro*, at 235. Nurse Regueira's report fails to establish this level of certainty. (**ECF No. 34-9**).

Moreover, her assertion that the "demise could have been avoided" is speculative and does not demonstrate that the nurses' actions were the most probable cause of death. A jury cannot find causation based on mere speculation and conjecture. *See Negrón-Adames v. Dorado Health Inc.*, 2023 WL 7298776, at \*6,

The Court also notes that even if considered, Dr. Adams' report would still fail to establish causation. Like Nurse Regueira's report, Dr. Adams' testimony focuses primarily on deviations from the standard of care. (**ECF No. 34-7**). Upon review of his seven-page report, the Court finds only two sentences that address causation. Those statements are: (1) "[t]he combination of lack [] of diligence and the poor nursing care as commented on by . . . Regueira in her report, of which I certainly agree, resulted in a surgical mortality"; and (2) "the deviations resulted in the death of [Decedent]." (**ECF No. 34-7 at 6-7**).

Like Nurse Regueira's report, Adams' statement might lead to *inferences* that the deviations were *a* factor in the decedent's death. Still, that is not enough. *See López-Ramírez v. Grupo HIMA San Pablo, Inc.*, 16-cv-3192, 2020 WL 5351851 (D.P.R. Sept. 04, 2020) (finding summary judgment proper where the plaintiff's "lack of admissible expert testimony" could not show that doctor's "conduct was sufficiently blatant that a lay person could infer that negligence aggravated" patient's rather benign facial spasm thereby "most probably caus[ing]" a cerebral infarction) (emphasis added).

However, it fails to bridge the "analytical gap" necessary to prove that the breaches were the "substantial" or "most probable factor" leading to the decedent's death. *See Muñiz-Núñez v. Am. Home Prod. Corp.*, 582 F. Supp. 459, 462 (D.P.R. 1984) (citing W. Prosser, *Law of Torts,* § 41, (4 Ed., 1971) ("for negligence, the plaintiff . . . must introduce evidence . . . that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result. A mere possibility of such causation is not

enough; and when the matter remains one of pure speculation or conjecture . . . the court [must] direct a verdict for the defendant.")); *see also McGovern ex rel. McGovern v. Brigham & Women's Hosp*., 584 F. Supp. 2d 418, 426 (D. Mass. 2008) (finding there was too great of "an analytical gap" in the expert's opinion that a vacuum-assisted delivery caused a stroke where expert failed to reliably apply his experience to the case facts).

 This is especially true, given Dr. Adams' report stakes his conclusions on Nurse Reguira's findings. Dr. Adams' report states, "I have reviewed [Nurse Regueira's Report] and support her criticisms of the nursing care provided to the decedent . . . Certainly, I will defer to her expert report which outlines the deficiencies and lack of critical care to the deceased." (**ECF No. 34-7 at 4**). This statement, in conjunction with the statements previously analyzed from his deposition, suggest his report is not based on "sufficient facts or data" that are the "product of reliable principles and methods" that he had "reliably applied" to the facts of this case, as required by Fed. R. Evid. 702. *See Carrozza v. CVS Pharmacy, Inc.*, at 55-56. Accordingly, Plaintiff is without additional support to substantiate the causal nexus to withstand summary judgment, as the admissible evidence demonstrates there is no material fact in dispute regarding causation. *See Rodríguez v. Hospital San Cristóbal, Inc.*, 91 F.4th 59 (1st Cir. 2024) (absence of admissible expert testimony under Fed. R. Evid. 702 led to the plaintiff being unable to establish a causal nexus between the alleged negligence and the patient's death. Consequently, summary judgment was granted for the defendants against plaintiffs for their medical malpractice claim under Puerto Rico law.).

In brief, Plaintiff fails to establish a sufficient causal nexus between the alleged nursing negligence and Decedent's death. Plaintiff alleged that the nursing staff's failure to timely act during Decedent's hospital stay resulted in her death. To that end, but short

of a establishing a causal nexus, Plaintiff's expert Nurse Regueira identified multiple failures by the nursing staff. However, neither Nurse Regueira or Dr. Adams' reports or testimony established that these alleged failures "most likely" caused, by a preponderance of the evidence, Decedent's death. *See Vega-Martínez v. Hosp. San Antonio Inc.,* 2022 WL 4539850, at *3 (finding the evidence without the aid of expert testimony insufficient to "make out causation under Puerto Rico law, . . . [and] that the negligent act or omission was the factor that most likely caused the harm.")

The reports contained speculative conclusions, such as the assertion that Decedent's death "could have been avoided" with proper nursing care, which is inadequate to meet the causation standard. (**ECF No. 34-9 at 18**); *see López-Ramírez v. Grupo HIMA San Pablo, Inc.*, 2020 WL 5351851, at 5 (finding summary judgment proper where the Court had previously "struck [p]laintiffs' expert report" in part because it was "impossible to determine [if] . . . it is based solely on the [expert physician's] personal opinion." Without said report, court found no material fact in dispute regarding alleged negligence. Consequently, without admissible expert testimony to substantiate causation, there is no material fact in dispute, and summary judgment is appropriate. *See e.g.*, *Rodríguez v. Hospital San Cristóbal, Inc.*, 91 F.4th 59 (1st Cir. 2024) (no causal nexus established where expert testimony not admissible under Fed. R. Evid. 702); *Vega-Martínez v. Hosp. San Antonio Inc.*, at 3 (without the aid of expert testimony, plaintiff could not establish that negligence "most likely caused the harm."); *López-Ramírez,* at 5 (without previously struck expert report, plaintiff's medical malpractice action could not withstand summary judgment).

### b. *Defendants' Liability for the Conduct of Non-Employee Doctor with Admitting Privileges*

In addition to claims against the nursing staff, Plaintiffs assert that Defendants are responsible for Dr. Matos's negligent acts and omissions, which they allege contributed to Decedent's harm. Specifically, the Complaint faults Dr. Matos directly for negligence under Articles 1536 and 1541 of the Puerto Rico Civil Code. (**ECF No. 1 at 13-15**.)

They claim Dr. Matos fell below the standard of care by failing to modify antiplatelet therapy pre-surgery, inadequately monitoring post-operative care, delaying a necessary return to surgery to control hemorrhaging, and failing to intervene in a timely manner to address a massive neck bleed. *Id.* at 10. According to Plaintiffs, this failure resulted in compression of the carotid artery, causing the Decedent to suffer an ischemic stroke and, ultimately, death. *Id.* at 8, 14.

Although Plaintiffs acknowledge that Dr. Matos is not Defendants' employee, he argues Defendants cannot escape liability for Dr. Matos' conduct based on this fact. Moreover, they argue Defendant committed breaches under the corporate negligence doctrine, which can subject hospitals to liability. (**ECF No. 1 at 7-13**).

Defendants argue that Dr. Matos is not an employee of theirs and therefore, the Hospital cannot be held vicariously liable for his actions. (**ECF No. 34 at 21**). Defendants emphasize that Dr. Matos was merely granted medical privileges to use Defendants' facilities to treat his private patients, including the Decedent. *Id.* Further, they highlight Decedent sought treatment directly from Dr. Matos as his private patient and not through the Hospital. *Id*; (**ECF No. 34-1 at ¶ 34**; **ECF No. 37 ¶ 35**).

Defendants further contend that Plaintiff lacks sufficient evidence to establish direct liability on their part concerning the concession of privileges to Dr. Matos. (**ECF**

**No. 34 at 21**). They contend that Plaintiff has no evidence showing that Defendants failed to carefully select or monitor Dr. Matos, nor any evidence of repeated malpractice by Dr. Matos that should have led to his privileges being revoked. (**ECF No. 34-1 at 13-14**). Moreover, there is no expert testimony establishing that Defendants failed in their corporate duties regarding Dr. Matos' privileges. *Id*. Thus, Defendants request that the Court grant their Motion, as Plaintiff has not provided the required evidence to substantiate claims of negligence against Dr. Matos or hold Defendants liable for his actions. (**ECF No. 34 at 22**).

> **i.    Applicable Law**

Under Puerto Rico law, "[i]n a situation where the patient goes directly to the hospital seeking medical aid and the hospital 'provides' a doctor, the hospital will be jointly and severally liable for the negligent acts of said physician." *Recio v. Hosp. del Maestro*, 882 F. Supp. 220, 224–25 (D.P.R. 1995), *aff'd sub nom. Daniels-Recio v. Hosp. Del Maestro, Inc.*, 109 F.3d 88 (1st Cir. 1997). On the other hand, where the patient seeks medical care directly from the physician at his private office and is later hospitalized upon the doctor's recommendation at an institution where the physician enjoys privileges, "as a general rule the hospital will not be liable for the negligent actions of the physician not employed by it." *Id*.

Determining liability based on the scenarios presented by the *Recio* court boils down to "whether the patient has primarily entrusted the care of her health to the hospital or to the physician." *Nieves-Rivera v. Mues-Sánchez*, 16-cv-1873, 2020 WL 7001367, at *3 (D.P.R. Mar. 25, 2020) (citing *Recio v. Hospital del Maestro*, 882 F. Supp. 220, 224 (D.P.R. 1995).

In *Recio*, the court found several uncontroverted facts that absolved the defendant hospital from liability, and thus granted their motion for summary judgment. *Recio v. Hosp. del Maestro*, 882 F. Supp. 220, 225 (D.P.R. 1995). These uncontroverted facts included: (1) the plaintiff was initially treated by defendant-doctor at a private clinic unaffiliated with the defendant-hospital; (2) the doctor was not an employee of the hospital but only had admitting privileges; (3) the doctor instructed the plaintiff to "go to the emergency room" and treated her at the hospital; (4) at no time did the hospital designate the doctor to be the plaintiff's physician; and (5) the plaintiff, during her deposition, admitted that she relied upon the doctor for diagnosis and care and entrusted her health to him. *Recio v. Hosp. del Maestro*, at 225. These facts, among others, led the court to conclude that there was insufficient evidence to hold the hospital liable for the doctor's alleged negligence.

But when the patient has first gone directly to the physician's private office and then is treated at the hospital "on the physician's recommendation merely because said institution is one of several which the physician has the privilege of using," the hospital cannot be held liable for the physician's exclusive negligence. *Mercado–Velilla,* 902 F.Supp.2d at 236 (citing *Márquez-Vega,* 116 D.P.R. 397, 16 P.R. Offic. Trans. 487). In that situation, however, the hospital may be held liable for its own negligence. *Casillas-Sánchez v. Ryder Mem'l Hosp., Inc.,* 960 F. Supp. 2d 362, 366 (D.P.R. 2013).

### ii.    Discussion

Here, it is undisputed that Dr. Matos was not employed by Defendants but was a private physician treating Decedent. (**ECF No. 34-1 at ¶ 37-38**). As such, Defendants are not vicariously liable for Dr. Matos's alleged negligence based solely on the existence of hospital privileges. Thus, Plaintiff must show that Decedent "entrusted the care of her health to the hospital" for Defendants to be liable for Dr. Matos' acts or omissions committed while using hospital facilities. *Nieves-Rivera v. Mues-Sánchez*, 2020 WL 7001367, at *3 (citing *Recio*, at 224). To help make this determination, the Court draws from the uncontroverted facts identified in *Recio*. After doing so and viewing the entire record in the light most favorable to Plaintiff, drawing all reasonable inferences in his favor, the Court finds there to be no material dispute of fact that Decedent entrusted her health to Dr. Matos rather than the Hospital. *Farmers Ins. Exch. v. RNK, Inc.,* 632 F.3d 777, 779–80 (1st Cir. 2011).

To start, Dr. Matos was referred to Decedent by her cardiologist, Dr. Colón, after he performed an angiogram and diagnosed her with carotid stenosis. (**ECF No. 34-3 at 9-11**). Based on this private physician referral, Decedent saw Dr. Matos in his private office on December 9, 2021, where they discussed surgery. *Id.* at 10. Dr. Colón regularly referred patients to Dr. Matos for carotid artery procedures when he was unable to perform them himself, and Decedent's referral followed this same pattern. *Id.* Furthermore, Dr. Matos noted, with courtesy privileges at the Hospital, his involvement with Decedent's case stemmed from this direct referral to him by Dr. Colón, who recommended Dr. Matos perform a carotid endarterectomy surgery. *Id.* at 11. That decision between the two private physicians occurred before Decedent had been admitted to Defendants' facilities on January 25, 2022. *Id.* Dr. Matos is not an employee of the

Hospital and only had "courtesy privileges" there. (**ECF No. 34-1 at ¶ 37-38**); *see Reddy v. Good Samaritan Hosp. & Health Ctr*., 137 F. Supp. 2d 948, 953 (S.D. Ohio 2000) (explaining the "difference between the two types of privileges (active and courtesy) is that a physician with courtesy privileges can treat only a limited number of patients at the hospital in a particular year.") *Shulman v. Washington Hosp. Ctr*., 319 F. Supp. 252, 255 (D.D.C. 1970) (finding "courtesy" staff doctors "are allowed to treat their private patients at the hospital when space is available . . . but there is not a formal or informal agreement which is binding.").

Defendants evidence shows that Dr. Matos established a patient-doctor relationship by way of referral from Dr. Colón. *See Ramírez-Ortiz*, at 95 n. 5 (for hospital to avoid liability "evidence must be presented to determine whether the patient has entrusted his or her well-being to the physician specifically, rather than to the hospital generally."). Furthermore, Dr. Matos performed the carotid endarterectomy surgery at the directive of Dr. Colón, not because he happened to be the physician whom Defendants assigned to Decedent's care once admitted to the hospital. *Compare Ramírez-Ortiz*, at 95 (explaining when a patient "receives treatment from a specific doctor solely by virtue of a hospital's referral, and he or she does not demonstrate any meaningful level of participation in the selection of a particular physician, the patient may be seen to have entrusted his or her health first and foremost to the hospital as an institution.").

Defendants have shouldered the initial burden of "demonstrat[ing] the absence of a genuine issue of material fact" with competent evidence, coming in the form of Dr. Matos' deposition. *Ramírez-Ortiz*, at 93 ("competent evidence" includes "depositions"). Plaintiffs, on the other hand, have not "demonstrate[d] that a trier of fact reasonably could find in [its] favor." *Santiago–Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d

46, 52 (1st Cir. 2000) (internal citation omitted). Thus, the Court finds there is a lack of evidence that Plaintiff entrusted her health to the Hospital rather than to Dr. Matos. For those reasons, summary judgment is **GRANTED** in favor of Defendants such that they are not liable for the acts and omissions of Dr. Matos, a non-employee physician with courtesy privileges at the Hospital.

### c.    *Corporate Negligence*

As to the corporate negligence doctrine, Plaintiff has not demonstrated that Defendants "careless[ly] or imprudent[ly]" granted Dr. Matos privileges. *See Morales v. Monagas*, 723 F. Supp. 2d 416, 420 (D.P.R. 2010) (citing *Márquez-Vega v. Martínez-Rosado*, 116 D.P.R. 397, 405, 16 P.R. Offic. Trans. 487, 495 (1985)). While Plaintiff asserts that Defendants breached their corporate duty of care to protect the health of its patients, Plaintiffs have not presented evidence, much less relevant arguments, to establish this. (**ECF No. 36 at 22**). A hospital that fails to protect the health of its patients can be established by showing the medical institution failed to:

> (a) carefully select the physicians granted the privilege of using its facilities; (b) requiring that said physicians keep up-to-date through professional advancement studies; (c) monitoring the labor of said physicians and taking action, when possible, in the face of an *obvious* act of malpractice; (d) discontinuing the privilege granted in the face of the repeated or crass acts of malpractice on the part of one of those physicians; and (e) keeping reasonably up-to-date on current technological breakthroughs.

*Morales v. Monagas*, 723 F. Supp. 2d 416, 419 (D.P.R. 2010) (citing *Márquez-Vega v. Martínez-Rosado,* 116 D.P.R. 397, 405, 16 P.R. Offic. Trans. 487, 495 (1985)) (emphasis added). Importantly, a hospital's "knowledge of the existence of prior lawsuits is an essential factor in determining whether or not the hospital exercised reasonable care in granting a physician staff privileges." *Batista-Acevedo v. Presbyterian Cmty. Hosp. Inc.*, 22-cv-01468, 2023 WL 2662074, at *2 (D.P.R. Mar. 27, 2023) (citing *Morales v.*

*Monagas,* 723 F. Supp. 2d 416, 421 (D.P.R. 2010)). Here the record is devoid of anything

that suggests Defendants failed to:

> (a) carefully select Dr. Matos when granting him privileges; (b) ensure Dr.
> Matos and other doctors kept "up-to-date" on the latest medical advances;
> (c) monitor Dr. Matos' work, and even if they did monitor him, there was a
> possibility to intervene in the face of *obvious* malpractice; (d) that Dr. Matos
> had been involved in "repeated" malpractice claims and Defendants
> nevertheless failed to revoke his privileges; or stay "up-to-date" on cutting-
> edge medical technology.

*See id.* Even more, Plaintiff does not allege much less support that Dr. Matos had been

implicated in *repeated* malpractice claims such that their failure to act and revoke his

privileges constitutes Defendants' *independent* duty to protect the health of their patients.

*See id.* Simply realleging Dr. Matos' *own* purported breaches of the standard of care, as

Plaintiff does in his Opposition to Defendants' Motion, is not enough to show Defendants

as a corporation were negligent. (**ECF No. 36**).

   While not binding on this Court, we find it logical to extend here the Court's finding

in *Kevin C. v. Foundations Behav. Health* regarding expert testimony for claims of

corporate negligence. 705 F. Supp. 3d 368, 385 (E.D. Pa. 2023). There the Court found

that "claims of corporate negligence"—claims that "arise[ ] from the policies, actions, or

inaction of the institution itself"—"where the hospital's negligence is not obvious" do

require "expert testimony to establish that the hospital deviated from an accepted

standard of care and that the deviation was a substantial factor in causing the harm to the

plaintiff." *Kevin C. v. Foundations Behav. Health*, 705 F. Supp. 3d 368 at 385. Likewise,

here the underlying medical malpractice allegations, as previously discussed, are not

obvious thereby dispensing with the need for expert testimony. Similarly, Plaintiff's

claims of corporate negligence are also far from clear on their face. Thus, Plaintiff needed

the help of expert testimony to establish Defendants deviated from the corporate duty of

care to protect the health of its patient. *See Kevin C. v. Foundations Behav. Health*, at 385-386 (granting summary judgment where "alleged corporate negligence was not obvious, so expert testimony was necessary" based on plaintiff's theory of "direct corporate negligence" relying on allegations that defendants failed to train, provide adequate care, and monitor their systems.). A review of the record does not reveal anything to this effort.

Taken together, Plaintiff's claim under the corporate negligence doctrine cannot survive summary judgment. Accordingly, the Court finds no genuine issue of material fact on this issue, and summary judgment in favor of Defendants on the corporate negligence claim is **GRANTED**.

## VIII. CONCLUSION

For the reasons set forth above, Plaintiff has failed to meet his burden of showing that it is not a legal certainty that his claim for emotional damages involves less than $75,000 under 28 U.S.C. § 1332. This alone merits dismissal.

Additionally, even assuming Plaintiff could satisfy the jurisdictional amount, he fails to establish medical malpractice causation, as his experts did not provide sufficient admissible testimony to demonstrate that Defendants' negligence was the most probable cause of his grandmother's death.

Moreover, Plaintiff's claims under the corporate negligence doctrine fail for lack of evidence. Plaintiff has not demonstrated that the Hospital failed in their duty to carefully select, monitor, or revoke Dr. Matos's privileges, nor has Plaintiff provided expert testimony to support these allegations. Without such evidence, the corporate negligence claim cannot proceed.

Accordingly, this medical malpractice action is **DISMISSED** *with prejudice* in its entirety.  Defendants' Motion for Summary Judgment is **GRANTED**.[10] [11]

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 30th day of September, 2024.

/s/ María Antongiorgi-Jordán
**MARIA ANTONGIORGI-JORDAN**
**UNITED STATES DISTRICT JUDGE**

---

[10]    If Plaintiff wishes, he may refile in the appropriate state court. *See Torres v. Drs. Ctr. Hosp. Manatí*, at *6 (finding plaintiff's claim should have "remained in state court, where it rightfully belongs."); *see also Sánchez-Arroyo v. Eastern Airlines, Inc.*, 835 F.2d 407, 408 (1st Cir. 1987) (action by airline passenger against airline properly dismissed, finding no "gross miscarriage of justice" and plaintiff was free to file suit in Puerto Rico court).

[11]    Plaintiff's request for "attorney's fees to restitute Plaintiff's counsel's valuable time in opposing the frivolous dispositive motion and to discourage repetition of this type of filing in the future" is **DENIED**. (**ECF No. 36 at 23-24**).